## AFFIDAVIT OF ROBERT J. BOSKEN

I, Robert J. Bosken, being duly sworn, depose and state as follows:

## <u>INTRODUCTION</u>

1.        I am a Special Agent with the U.S. Department of Veterans Affairs ("VA"),

Office of Inspector General ("OIG"), and have been so employed since 2010.  Prior to joining

the VA OIG, I was employed as a Special Agent with the U.S. Postal Service, Office of

Inspector General for approximately six years.  During my law enforcement career, I have

received extensive law enforcement training, including specialized training on investigations of

the distribution of controlled substances.  My training has included completing the Federal Law

Enforcement Training Center's Criminal Investigator Training Program, the U.S. Drug

Enforcement Administration's Basic Narcotics School, the Federal Law Enforcement Training

Center's Covert Electronic Surveillance Program, and the New England State Police Information

Network's Pharmaceutical Diversion Training.

2.        In addition to my training, I have had experience in the investigation of the illegal

distribution of controlled substances.  I have participated in numerous drug investigations as a

case agent and in a subsidiary role.  With exposure to drug-related cases, I have become familiar

with the appearance, packaging, and distribution methods and techniques used to illegally

distribute numerous controlled substances.  I have debriefed defendants, informants, and

witnesses who had personal knowledge about drug activities.  I have personally participated in

several aspects of drug investigations, including conducting surveillance, using cooperating

witnesses, and utilizing undercover law enforcement agents.  During my law enforcement career,

I have also participated in the preparation and execution of numerous search warrants at both the

state and federal level.  These search warrants have resulted in the seizure of controlled

substances; paraphernalia involved in the manufacture and distribution of controlled substances;

United States currency; records of narcotics and monetary transactions; drug customer lists; and other documents relating to the manufacturing, transportation, ordering, purchasing, and distribution of controlled substances, as well as collection, expenditure, accounting, transportation, and laundering of drug proceeds.

3.     This affidavit is submitted in support of a criminal complaint charging Michael Sexton (DOB XX/XX/1959), of Bedford, Massachusetts with distributing and dispensing controlled substances in violation of Title 21, United States Code, Section 841(a)(1), and in support of a search warrant for 100 Pride Way, Unit 115, Bedford, Massachusetts, which is described in Attachment A.  Based on the facts set forth below, I have probable cause to believe that a search of this location will result in the seizure of items that constitute evidence, fruits, and instrumentalities of violations of 21 U.S.C. §841(a)(1); specifically, the items described in Attachment B.

4.     Additionally, this affidavit is submitted in support of a criminal complaint charging Demone Coleman (DOB xx/xx/1979), of Boston, Massachusetts with distributing and dispensing controlled substances in violation of Title 21, United States Code, Section 841(a)(1), and in support of a search warrant for 229A River Street #202, Mattapan, Massachusetts, described in Attachment A.  Based on the facts set forth below, I have probable cause to believe that a search of this location will result in the seizure of items that constitute evidence, fruits, and instrumentalities of violations of 21 U.S.C. §841(a)(1); specifically, the items described in Attachment B.

5.     Finally, this affidavit is submitted in support of a criminal complaint charging Austin Wilkerson (DOB XX/XX/1976), of Boston, Massachusetts with distributing and dispensing controlled substances in violation of Title 21, United States Code, Section 841(a)(1).

6.     This affidavit is based on my own personal involvement in this investigation, my

training and experience, my discussions with other law enforcement officers involved in this investigation, and discussions with other law enforcement officers experienced in narcotics trafficking.  In submitting this affidavit, I have not included each and every fact known to me concerning this investigation.  Rather, I have set forth only the facts that I believe are necessary to: i) establish that probable cause exists to charge Michael Sexton with the offense of distributing cocaine base, a schedule II controlled substance, in violation of 21 U.S.C. §841(a)(1); ii) establish that probable cause exists to search 100 Pride Way, Unit 115, Bedford, Massachusetts; iii) establish that probable cause exists to charge Demone Coleman with the offense of distributing cocaine base, a schedule II controlled substance, in violation of 21 U.S.C. §841(a)(1); iv) establish that probable cause exists to search 229A River Street #202, Mattapan, Massachusetts; and v) establish that probable cause exists to charge Austin Wilkerson with the offense of distributing cocaine base, a schedule II controlled substance, in violation of 21 U.S.C. §841(a)(1).

## INVESTIGATION

7.     In January 2017, agents from the VA OIG, working together with law enforcement officers from the VA Police Service ("VAPS"), began investigating the illegal distribution of controlled substances at the Veterans Affairs Medical Center ("VAMC") in Bedford, Massachusetts.  This investigation was later joined by the Drug Enforcement Administration ("DEA").  The VAMC provides multiple services to veterans of the U.S. Armed Forces, including alcohol and drug abuse rehabilitation services.

8.     In January 2017, a VA OIG cooperating witness ("CW")[1] told me that Michael Sexton ("SEXTON") was regularly distributing cocaine base ("crack cocaine") from his Bedford

---

[1] CW is a paid informant whose criminal record includes prior charges of larceny, shoplifting, and criminal trespass.

Green apartment to veterans enrolled as patients at the VAMC.  This CW has proven reliable, having provided VA OIG agents with information in the past that led to the arrest and conviction of individuals for drug distribution at the VAMC.  Bedford Green is a VA-subsidized housing complex located at the VAMC that is available to eligible veterans.  SEXTON is a veteran who lives in an apartment within Bedford Green with a residential address of 100 Pride Way, Unit 115, Bedford, Massachusetts ("SEXTON's apartment").  CW identified SEXTON's cellular telephone number as 857-312-8562.  A review of VA and T-Mobile subscriber records corroborates this information.  Additionally, CW identified SEXTON's apartment landline telephone number as 781-538-5243.  Comcast records reported that telephone number 781-538-5243 was subscribed to Patricia Mitchell, 100 Pride Way, Unit 115, Bedford, Massachusetts.  CW reported SEXTON meets his drug source either at the VAMC campus or at the Bedford Market Place, which is a shopping complex in close proximity to the VAMC campus.

### January 26, 2017 CW Purchase of Crack Cocaine from SEXTON

9.      On January 26, 2017, CW reported to agents that earlier in the day CW had spoken with SEXTON in person and SEXTON had offered to sell CW crack cocaine.  On January 26, 2017, VA OIG agents provided $50 to CW and instructed CW to purchase crack cocaine from SEXTON.  The serial numbers on the Government funds provided to CW had been previously recorded.  At the direction of agents, CW entered SEXTON's apartment located within Bedford Green to purchase crack cocaine from SEXTON.  Prior to entering Bedford Green, VA OIG agents searched CW and found no contraband or money other than the Government funds CW had been provided.  A short time after entering Bedford Green, CW exited and met with law enforcement agents.  CW provided law enforcement agents with a small glassine wrapping containing a hard white-colored substance consistent with the appearance of crack cocaine.  VA OIG agents conducted a subsequent search of CW, and no other contraband

or money was located.  CW reported to law enforcement that CW purchased the crack cocaine

from SEXTON, within SEXTON's apartment, for $50.  CW reported that SEXTON agreed to

sell CW additional quantities of crack cocaine in the future.  An audio recording CW made of the

meeting with SEXTON corroborates this information.  The substance CW purchased from

SEXTON on January 26, 2017, field-tested positive for the presence of cocaine, and subsequent

DEA laboratory analysis confirmed that the substance contained cocaine base.

### January 31, 2017 CW Purchase of Crack Cocaine from SEXTON

10.     On January 31, 2017, VA OIG agents provided $220 to CW and instructed CW to

purchase crack cocaine from SEXTON.  The serial numbers on the Government funds provided

to CW had been previously recorded.  Prior to meeting SEXTON, VA OIG agents searched CW

and found no contraband or money other than the Government funds CW had been provided.

Under the direction and observation of law enforcement, CW met with SEXTON in front of

Bedford Green, and an audio recording was made of their interaction.  A short time after meeting

with SEXTON, CW left the VAMC campus and met with law enforcement agents.  CW reported

CW purchased from SEXTON a single foil packet containing four glassine bags containing a

hard white-colored substance consistent with the appearance of crack cocaine for $220.  VA OIG

agents conducted a subsequent search of CW, and no other contraband or money was located.

The substance CW purchased that from SEXTON on January 31, 2017, field-tested positive for

the presence of cocaine, and subsequent DEA laboratory analysis confirmed that the substance

contained cocaine base.

### May 18, 2017 CW Purchase of Crack Cocaine from SEXTON

11.     On May 18, 2017, VA OIG agents provided $200 to CW and instructed CW to

purchase crack cocaine from SEXTON.  The serial numbers on the Government funds provided

to CW had been previously recorded.  Prior to meeting SEXTON, VA OIG agents searched CW

and found no contraband or money other than the Government funds CW had been provided.

Later on May 18, 2017, under the direction and observation of agents, and while being audio

recorded, CW met SEXTON behind Bedford Green and gave SEXTON the $200 in Government

funds.  Subsequently, SEXTON and CW entered Bedford Green where SEXTON informed CW

that his drug source would be arriving within minutes.  A short time later, law enforcement

observed SEXTON and CW exit Bedford Green.  SEXTON then travelled to a VAMC parking

lot and entered a gray-colored Mercedes-Benz sedan while CW waited in front of Bedford

Green.  The vehicle drove from the parking lot back to Bedford Green, and after SEXTON

exited, the vehicle drove away and exited the VAMC campus.  CW and SEXTON then re-

entered Bedford Green, proceeded to SEXTON's apartment, and completed the drug transaction.

A short time later, CW exited Bedford Green and immediately met with law enforcement agents.

CW provided law enforcement agents with a small glassine wrapping containing a hard white-

colored substance consistent with the appearance of crack cocaine.  CW reported to law

enforcement that CW obtained the crack cocaine from SEXTON, within SEXTON's apartment.

An audio recording CW made of the meeting corroborates this information.   VA OIG agents

conducted a subsequent search of CW, and no other contraband or money was located.  DEA

laboratory analysis later confirmed that the substance CW purchased from SEXTON on May 18,

2017, contained cocaine base.[2]

## May 31, 2017 CW Purchase of Crack Cocaine from SEXTON -
## COLEMAN Identified as SEXTON's First Drug Source

12.      On May 31, 2017, VA OIG agents provided $300 to CW and instructed CW to

purchase crack cocaine from SEXTON.  The serial numbers on the Government funds provided

---

[2] Due to a change in VA OIG policy, drug evidence purchased after May 17, 2017 is no longer
field tested.

to CW had been previously recorded.  Prior to meeting SEXTON, VA OIG agents searched CW and found no contraband or money other than the Government funds CW had been provided.  CW then entered Bedford Green, and a short time later, CW exited the apartment building and immediately met with law enforcement agents.  CW reported that CW had given SEXTON $300 within SEXTON's apartment.  CW then observed SEXTON place a phone call to his source of supply of crack cocaine.  At one point, CW was given SEXTON's phone and CW spoke with a male party who identified himself as SEXTON's drug source and stated he would be arriving at the VAMC campus that evening to give CW the crack cocaine.

13.      Later that evening, law enforcement agents observed a white-colored BMW sedan bearing Massachusetts registration 3FX718 pull onto VAMC property and drive towards Bedford Green.  SEXTON was observed waiting outside Bedford Green as the white BMW pulled up.  SEXTON was then observed getting into the back seat of the BMW.  At approximately the same time, at the direction of law enforcement, CW called SEXTON's cellular telephone and spoke with SEXTON who stated he was currently meeting his drug source.

14.      A subsequent Massachusetts Registry of Motor Vehicles ("RMV") records check of Massachusetts registration 3FX718 revealed that the vehicle was a 2010 BMW 750I, registered to Demone Coleman ("COLEMAN") at 134 Greenwood Street, Dorchester, MA.

15.      A short time later, SEXTON exited the BMW and returned to his apartment in Bedford Green.  At the direction of law enforcement agents, CW entered Bedford Green and proceeded to SEXTON's apartment to complete the drug transaction.  Prior to entering Bedford Green, VA OIG agents searched CW and found no contraband or money.  After being in SEXTON's apartment for a short time, CW later exited Bedford Green and immediately met with law enforcement.  CW provided law enforcement with a glassine wrapping containing a

hard white-colored substance consistent with the appearance of crack cocaine, and stated

SEXTON had provided CW with this glassine wrapping within SEXTON's apartment.  An audio

recording CW made of the meeting with SEXTON corroborates this information.  VA OIG

agents conducted a subsequent search of CW, and no other contraband or money was located.

DEA laboratory analysis has confirmed that the substance SEXTON gave to CW in exchange for

$300 on May 31, 2017 contained cocaine base.

      16.    While CW was completing the controlled purchase of crack cocaine from

SEXTON, law enforcement agents engaged in mobile surveillance of the BMW that had left the

scene.  Agents followed the vehicle from Bedford, Massachusetts to Milton, Massachusetts.

When the vehicle reached Milton, at the direction of law enforcement, a marked Massachusetts

State Police ("MSP") cruiser conducted a traffic stop of the vehicle.  The MSP trooper noted two

occupants in the vehicle and the vehicle's driver identified himself as COLEMAN.  COLEMAN

was given a verbal warning for a minor motor vehicle violation and released.

      17.    After CW's controlled buy of crack cocaine from SEXTON, agents reviewed

SEXTON's cellular telephone 857-312-8562 call history records.  Law enforcement officers

noted that on May 31, 2017, at the time CW reported SEXTON had called his drug supply

source on the telephone, SEXTON received calls from 617-435-8861.  A review of telephone

records revealed that cellular telephone number 617-435-8861 was subscribed to Rhonda

Coleman, 134 Greenwood Street, Dorchester, MA.  A review of Massachusetts' Board of

Probation records identifies COLEMAN's mother's first name as "Rhonda".  Based on the

common address of both the cellular phone subscriber and the BMW registration, the identity of

COLEMAN's mother's name as Rhonda, the toll analysis of SEXTON's phone on the date of the

controlled buy, and my training and experience, I believe that COLEMAN is the user of 617-

435-8861.

**June 22, 2017 CW Purchase of Crack Cocaine from SEXTON -**
**SEXTON Observed Meeting with COLEMAN**

18.     On June 22, 2017, VA OIG agents provided $400 in Government funds to CW for CW to purchase crack cocaine from SEXTON.  The serial numbers on the Government funds provided to CW had been previously recorded.  Prior to meeting SEXTON, VA OIG agents searched CW and found no contraband or money other than the Government funds CW had been provided.  CW entered the VAMC campus and met SEXTON outside of Bedford Green and waited for SEXTON's drug source to arrive.  Later that day, while under surveillance by law enforcement, CW contacted investigators and reported that SEXTON's drug source had arrived.  Law enforcement saw SEXTON exit Bedford Green and approach CW.  Surveillance agents saw CW hand SEXTON something and saw SEXTON walk directly to a white-colored Toyota Camry sedan bearing Massachusetts registration 4RN384 that was parked near Bedford Green.  Law enforcement agents observed SEXTON enter the vehicle, and then a few minutes later, SEXTON exited the vehicle and entered Bedford Green.  At the direction of law enforcement, CW followed SEXTON into Bedford Green.  The Toyota Camry then departed the VAMC campus.

19.     A short time after SEXTON had entered Bedford Green, CW exited the apartment building and immediately met with law enforcement agents.  CW provided agents with three small glassine wrappings containing a hard white-colored substance consistence in appearance with crack cocaine, and stated SEXTON had provided CW with these glassine wrappings.  An audio recording CW made of the meeting corroborates this information.  VA OIG agents conducted a subsequent search of CW, and no other contraband or money was located.   The substance CW purchased from SEXTON on June 22, 2017, was sent to a DEA laboratory for analysis.  Those results are pending.

20.     While CW was completing the controlled purchase of crack cocaine from

SEXTON, law enforcement engaged in mobile surveillance of the Toyota Camry.  The vehicle was followed from Bedford Green to the Bedford Market Place where it was found parked with no occupants.  A short time later, law enforcement observed COLEMAN entering the parked Toyota Camry and then exiting the area.  A records check of Massachusetts registration 4RN384 with the RMV revealed that Toyota Camry was a rental car.  Based on my training and experience, I know that drug traffickers often use rental cars to help facilitate their business and avoid detection by law enforcement.

21.     After the June 22, 2017 controlled buy, investigators obtained records for the cellular telephone numbers used by SEXTON (857-312-8562) and COLEMAN (617-435-8861).  After conducting toll analysis and checking the call logs for both numbers for June 22, 2017, investigators learned that SEXTON and COLEMAN were in contact with each other prior to and during the time of the June 22, 2017 controlled purchase of suspected crack cocaine.

**COUNT I**
**June 29, 2017 CW Purchase of Crack Cocaine from SEXTON –**
**SEXTON Observed Meeting with COLEMAN**

22.     On June 29, 2017, VA OIG agents provided CW with $350 in Government funds for CW to purchase crack cocaine from SEXTON.  The serial numbers on the Government funds provided to CW had been previously recorded.  Prior to meeting SEXTON, VA OIG agents searched CW and found no contraband or money other than the Government funds CW had been provided.  While under surveillance by law enforcement, CW met SEXTON outside of Bedford Green, where CW provided SEXTON with the $350 in Government funds, and they waited for SEXTON's drug source to arrive.

23.     Approximately one hour later, law enforcement agents saw a blue-colored Ford F150 pickup truck bearing Massachusetts registration 5DD723 arrive at the VAMC campus and

travel toward Bedford Green.[3]  While waiting with SEXTON and still under surveillance, CW

contacted law enforcement and reported that SEXTON said the approaching truck was

SEXTON's drug source.  This information was later confirmed through an audio recording CW

made of the transaction in which SEXTON can be heard stating, "[y]ep, that's the truck, look, a

Ford", as the Ford pick-up truck approached Bedford Green.

24.     Law enforcement observed SEXTON leave CW, walk directly to the truck, and

enter it.  SEXTON remained inside the truck for approximately three minutes before he exited

and walked directly to CW to complete the drug transaction.  After completing the transaction,

CW immediately met with law enforcement and produced three small glassine wrappings

containing a hard white-colored substance consistent in appearance with crack cocaine.  CW

reported that CW obtained these glassine wrappings from SEXTON in exchange for the $350 in

Government funds.  VA OIG agents conducted a subsequent search of CW, and no other

contraband or money was located.  The substance CW purchased from SEXTON on June 29,

2017, was sent to a DEA laboratory for analysis.  Those results are pending.

25.     Immediately after the drug sale was completed, investigators commenced

surveillance of the Ford F150 and followed it off VAMC property.  Agents identified

COLEMAN as the driver and sole occupant of the vehicle.  The Ford F150 was then followed

from Bedford Green to the Bedford Market Place, where it was found parked but COLEMAN

had already exited the vehicle.  COLEMAN was observed inside a Marshalls department store,

located within the Bedford Market Place, talking on a cellular telephone and shopping.  Law

enforcement observed COLEMAN approach a Marshalls' cashier, purchase something, leave the

store, and then enter the Ford pick-up truck and leave the area.  Immediately after COLEMAN

---

[3] RMV records report that MA 5DD723 is a rental vehicle.

left Marshalls, a store manager assisted law enforcement by searching the cash register that

COLEMAN had just visited.  A $20 bill with serial number JC78179942B was retrieved from

the cash register.  Agents confirmed that the $20 bill, bearing serial number JC78179942B, was

part of the original Government funds provided to CW on June 29, 2017, to purchase crack

cocaine from SEXTON earlier that evening.

26.     Telephone toll records for both SEXTON's and COLEMAN's cellular telephones

indicate that both men were in contact with one another during the controlled buy that took place

on June 29, 2017.

27.     Less than 12 hours after the completion of the June 29, 2017 controlled buy, the

Ford F150 pickup truck bearing Massachusetts registration 5DD723 was observed parked in the

vicinity of 229A River Street, Mattapan, Massachusetts at approximately 5:14 a.m.

### July 27, 2017 CW Purchase of Crack Cocaine from SEXTON - SEXTON Observed Meeting with Second Drug Source

28.     On July 27, 2017, VA OIG agents provided CW with $350 in Government funds

for CW to purchase crack cocaine from SEXTON.  The serial numbers on the Government funds

provided to CW had been previously recorded.  Prior to meeting SEXTON, VA OIG agents

searched CW and found no contraband or money other than the Government funds CW had been

provided.  At the direction of agents, CW entered SEXTON's apartment and provided SEXTON

with the $350 in Government funds.  A short time later, CW confirmed to law enforcement via

text message that CW had met with SEXTON and that SEXTON's drug source was travelling to

the VAMC.  An audio recording CW made of the interaction with SEXTON corroborates this

information.

29.     Following CW's report that SEXTON's drug source would be arriving at the

VAMC campus shortly, law enforcement agents observed SEXTON leave Bedford Green, travel

throughout the town of Bedford on foot, and then return to the VAMC.  Investigators observed

SEXTON stop at a bus stop located on VA property.  CW contacted law enforcement and

reported that CW had learned that SEXTON was waiting at a bus stop for his drug source to

arrive.

30.     Approximately two minutes later, agents saw a blue-colored Ford F150 pickup

truck bearing Massachusetts registration 5DD723 arrive at the VAMC.  Investigators had

previously observed the same vehicle being used to deliver crack cocaine to SEXTON at the

VAMC.  The Ford F150 stopped at the bus stop at which SEXTON was waiting.  SEXTON was

then observed entering the Ford pick-up truck, which then travelled from the bus stop to the front

entrance of Bedford Green.  SEXTON was observed exiting the vehicle and entering Bedford

Green to complete the drug transaction with CW.  A short time later, CW exited Bedford Green

and immediately met with law enforcement.  CW turned over three small glassine wrappings

containing a hard white-colored substance consistent with the appearance of crack cocaine.  CW

reported that CW obtained these glassine wrappings from SEXTON within SEXTON's

apartment in exchange for the $350 in Government funds.  VA OIG agents conducted a

subsequent search of CW, and no other contraband or money was located.  DEA laboratory

analysis has confirmed that the substance SEXTON sold to CW in exchange for $350 on July 27,

2017 contained cocaine base.

31.     While CW was completing the drug transaction with SEXTON, agents

commenced surveillance of the Ford pick-up truck and followed it off VA property.  Agents

followed the vehicle from Bedford Green to a Sunoco gas station located at 180 Great Road,

Bedford, MA.  Law enforcement watched the vehicle's sole occupant exit the vehicle and enter

the gas station.  A short time later, the suspected drug source exited the gas station, entered the

Ford pick-up truck, and left the area.  Immediately after SEXTON's suspected drug source left

the Sunoco gas station, an employee confirmed to law enforcement that the Ford pick-up truck's

driver had just paid with cash bills.  Agents recovered two $20 bills, with serial numbers
IL91156955A and MB76203967F, from the Sunoco gas station's cash register.  These $20 bills,
bearing serial numbers IL91156955A and MB76203967F, were part of the original Government
funds provided to CW to purchase crack cocaine from SEXTON on July 27, 2017.  Investigators
were also able to obtain a copy of surveillance footage showing the driver of the Ford pick-up
truck make the cash purchase within the Sunoco gas station.[4]

32.     Through analysis of SEXTON's cellular telephone call history records, law
enforcement agents identified a telephone number, 781-510-2400, that contacted SEXTON
immediately prior and during the time of the July 27, 2017 controlled buy, that they suspect was
used by SEXTON's drug source.

### COUNT II
### August 10, 2017 CW Purchase of Crack Cocaine from SEXTON - SEXTON's Second Drug Source Identified as WILKERSON

33.     On August 10, 2017, VA OIG agents provided CW with $350 in Government
funds for CW to purchase crack cocaine from SEXTON.  The serial numbers on the Government
funds provided to CW had been previously recorded.  Prior to meeting SEXTON, VA OIG
agents searched CW and found no contraband or money other than the Government funds CW
had been provided.  At the direction of agents, CW entered Bedford Green.  A short time later,
CW confirmed to law enforcement via text message that CW had met with SEXTON and that
SEXTON's drug source was travelling to the VAMC on a motorcycle.  An audio recording of
CW's interaction with SEXTON corroborates this information.

34.     Soon thereafter, law enforcement agents observed a dark-colored Suzuki
motorcycle bearing Massachusetts registration 2D2202 arrive at Bedford Green.  An RMV

---

[4] Law enforcement subsequently identified this individual as Austin Wilkerson.  *See* ¶¶34, 37, 43.

records check of MA 2D2202 revealed that the motorcycle was registered to an Austin

Wilkerson ("WILKERSON") at 522 Blue Hill Ave., Apartment 10, Boston, Massachusetts.

35.     At the same time that law enforcement observed the motorcycle arrive, CW

contacted agents and reported the operator of the arriving motorcycle was SEXTON's drug

source.  Investigators watched as SEXTON and CW met the motorcycle operator near Bedford

Green's front entrance.  All three individuals then entered the apartment building.

36.     A short time later, CW exited Bedford Green and immediately met with law

enforcement personnel.  CW produced three small glassine wrappings containing a hard white-

colored substance consistent in appearance with crack cocaine.  VA OIG agents conducted a

subsequent search of CW, and no other contraband or money was located.  CW reported that

within SEXTON's apartment, after SEXTON and WILKERSON bagged the crack cocaine, CW

provided SEXTON with the $350 in Government funds and SEXTON provided CW with the

crack cocaine.  An audio recording the CW made of the encounter corroborates this information.

DEA laboratory analysis has confirmed that the substance SEXTON gave to CW in exchange for

$350 on August 10, 2017, contained cocaine base.

37.     When shown WILKERSON's RMV photo after the controlled buy, CW stated,

"Oh you already know who it is" and later confirmed that SEXTON's second drug source was

the same individual pictured in WILKERSON's RMV photo.

38.     On August 10, 2017, following CW's controlled purchase of crack cocaine, law

enforcement agents continued to conduct surveillance on Bedford Green.  Approximately one

hour after WILKERSON entered Bedford Green, he was seen exiting Bedford Green and

returning to the parked motorcycle, where he opened the rear compartment of the motorcycle and

retrieved something from the vehicle's compartment.  WILKERSON then reentered Bedford

Green.  Approximately eleven (11) minutes later, CW contacted me and reported that several

15

Bedford Green residents were purchasing additional quantities of drugs from SEXTON within SEXTON's apartment.

39.     Following the August 10, 2017, controlled buy, law enforcement reviewed a Boston Police Department report regarding contact with WILKERSON that occurred in 2017. Within the police report, WILKERSON identified his cellular telephone number as 781-510-2400.  Sprint records reported that cellular telephone number 781-510-2400 was subscribed to Danielle Murray, 20 Sudan Street #3, Dorchester, MA.  Based on my training and experience, I know that drug dealers often put personal property, such as vehicles and phones, in other people's names to avoid police detection.  An analysis of telephone call history records indicated that SEXTON's apartment landline telephone number (781-538-5243) was in contact with WILKERSON's suspected cellular telephone number (781-510-2400) prior to and during the time of the August 10, 2017 drug transaction.

**COUNT III**
**September 5, 2017 CW Purchase of Suspected Crack Cocaine from SEXTON - SEXTON Observed Meeting with WILKERSON**

40.     On September 5, 2017, VA OIG agents provided $350 in Government funds to CW to purchase crack cocaine from SEXTON.  The serial numbers on the Government funds provided to CW had been previously recorded.  Prior to meeting SEXTON, VA OIG agents searched CW and found no contraband or money other than the Government funds CW had been provided.  While under surveillance by law enforcement agents, CW met SEXTON outside Bedford Green and handed SEXTON the $350 in Government funds.  SEXTON then rode away from Bedford Green on a bicycle.  According to CW, SEXTON was reportedly meeting his drug source near Marshalls in the Bedford Market Place who had already arrived and had travelled in his "work truck."

41.     Surveillance personnel followed SEXTON from Bedford Green to the Bedford

16

Market Place.  Upon arriving at the Bedford Market Place, SEXTON was seen meeting with an

individual whom investigators immediately recognized as WILKERSON from his Boston Police

Department booking sheet as well as surveillance video obtained from the Sunoco gas station on

July 27, 2017.  SEXTON and WILKERSON spoke to each other for a short period of time

before both men entered a parked U-Haul truck bearing Arizona registration AH71722.  A few

minutes later, SEXTON exited the truck and rode his bicycle back toward the VAMC campus.

42.     While under surveillance, SEXTON returned to the VAMC campus and briefly

met CW outside of Bedford Green.  After interacting with SEXTON, CW left and immediately

met law enforcement personnel and turned over three small glassine wrappings containing a hard

white-colored substance consistent in appearance with crack cocaine that CW reported obtaining

from SEXTON in exchange for the $350 in Government funds.  VA OIG agents conducted a

subsequent search of CW, and no other contraband or money was located.  The substance CW

purchased from SEXTON on September 5, 2017, was sent to a DEA laboratory for analysis.

Those results are pending.

43.     While CW completed the drug transaction with SEXTON, law enforcement

conducted mobile surveillance of WILKERSON and the U-Haul truck.  Agents followed the U-

Haul truck from the Bedford Market Place to a nearby CVS, where it had been parked.  A short

time later, law enforcement agents observed WILKERSON leave CVS, enter the U-Haul, and

then leave the area.  Immediately after WILKERSON left CVS, an employee assisted law

enforcement by searching the cash register that WILKERSON had just visited.  A $20 bill with

serial number IG06188921D was retrieved from the cash register.  This $20 bill, bearing serial

number IG06188921D, was part of the original Government funds that CW used to purchase

crack cocaine from SEXTON on September 5, 2017.  Additionally, law enforcement obtained

CVS security video that captured WILKERSON's activities within the store.  Using that security

video law enforcement agents were able to confirm that WILKERSON was the same individual whom they followed from Bedford Green in the Ford pick-up truck and observed at the Sunoco gas station on July 27, 2017.

44.     A subsequent analysis of cellular telephone call history records indicated that SEXTON and WILKERSON were in contact with one another prior to and during the time of the September 5, 2017, controlled buy.

**COUNT IV**
**September 27, 2017 CW Purchase of Crack Cocaine from SEXTON -**
**SEXTON Observed Meeting with COLEMAN**

45.     On September 27, 2017, VA OIG agents provided CW with $350 in Government funds for CW to purchase crack cocaine from SEXTON.  The serial numbers on the Government funds provided to CW had been previously recorded.  Prior to meeting SEXTON, VA OIG agents searched CW and found no contraband or money other than the Government funds CW had been provided.  While under surveillance by law enforcement, CW met SEXTON outside of Bedford Green where CW provided SEXTON with the $350 in Government funds, and they waited for SEXTON's drug source to arrive.

46.     Later that day, law enforcement agents saw SEXTON leave CW and enter Bedford Green.  A short time later, agents saw a red-colored Toyota Sienna minivan bearing Massachusetts registration 7BM135 arrive at the VAMC campus and stop near Bedford Green.[5] After a few minutes, SEXTON was observed inside the Toyota minivan with another male operating the vehicle.  Agents initiated mobile surveillance of the Toyota minivan, and observed it leave the VAMC, make a short trip in the surrounding area, and then return to the VAMC campus and stop near Bedford Green.  Law enforcement observed SEXTON exit the Toyota

---

[5] RMV records report that MA 7BM135 is a rental vehicle.

minivan and meet CW outside of Bedford Green.  After interacting briefly with SEXTON, CW

immediately met with law enforcement and turned over a small glassine wrapping containing a

hard white-colored substance consistent in appearance with crack cocaine that CW reported

SEXTON provided in exchange for the $350 in Government funds.  VA OIG agents conducted a

subsequent search of CW, and no other contraband or money was located.   The substance CW

purchased from SEXTON on September 27, 2017 was sent to a DEA laboratory for analysis, and

those results are pending.

47.     Immediately after the drug sale was finalized, investigators followed the Toyota

minivan off VAMC property to the Bedford Market Place.  The Toyota minivan's driver parked,

exited the vehicle, and entered the Marshalls department store.  Once inside the store, law

enforcement agents identified the vehicle's driver as COLEMAN, who was shopping and talking

on a cellular telephone.

48.     Law enforcement observed COLEMAN approach a Marshalls' cashier, purchase

something, exit the store, and then enter the Toyota Sienna and leave the area.  Immediately after

COLEMAN left Marshalls, a store manager assisted law enforcement by searching the cash

register that COLEMAN had just visited.  Two $20 bills with serial numbers IB 84080590E and

ME 55334337F were recovered from the cash register.  These $20 bills, bearing serial numbers

IB 84080590E and ME 55334337F, were part of the original government funds provided to CW

to purchase crack cocaine from SEXTON on September 27, 2017.

49.     Prior to the September 27, 2017 drug buy, law enforcement successfully obtained

a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §2703(c)(1)(A) for

information about the location COLEMAN's 617-435-8861 mobile phone.[6]  As a result, law

---

[6] The search warrant was issued by United States Magistrate Judge, the Hon. M. Page Kelley on
September 18, 2017.  *See* 17-MJ-6190-MPK.

enforcement obtained information of COLEMAN's phone for a period of thirty days, during all times of day and night, including: E-911 Phase I data; GPS data; latitude-longitude data; other precise location information; and data about which "cell towers" received a radio signal from COLEMAN's phone.  The warrant did not authorize the collection of any content of any communications.

50.     As a result of information gathered from the above mentioned warrant, law enforcement learned that GPS data, as well as latitude and longitude data, would often locate COLEMAN's phone within 438 meters (approximately 1400 feet) of Mattapan Square in Mattapan, Massachusetts.  These coordinates were usually obtained during early morning hours when most people would still be asleep.  It is important to note that 229A River Street, Mattapan, Massachusetts, the area where the Ford F150 rental was observed during the early morning hours of June 30, 2017, is within 438 meters of Mattapan Square.

51.     After COLEMAN left the Marshalls department store on September 27, 2017, law enforcement continued surveillance of him as he drove the Toyota minivan onto Interstate Highway 95 and headed south.  Surveillance followed COLEMAN off the highway onto Route 138 and continued surveillance as he took an immediate right onto Blue Hill River Road.  At approximately 10:15 p.m. surveillance was successful in following COLEMAN onto River Road in Mattapan behind the Boston Public Health Commission.  A few minutes later, the minivan was observed parked and unoccupied behind one of the apartment buildings located at 231 River Street in Mattapan.  A short time later law enforcement received a notification that COLEMAN's 617-435-8861 mobile phone was approximately 438 meters from Mattapan Square.

52.     A few days later law enforcement was conducting surveillance in the area of 229 River Street when COLEMAN was observed traveling away from the apartment buildings in the same Toyota minivan.  At approximately the same time, law enforcement located a possible

utility bill in the name of COLEMAN with an address of 229A River Street #202, Mattapan,

Massachusetts, using a law enforcement computer database.

53.     On October 13, 2017, law enforcement conducted surveillance in the area of

229A River Street in Mattapan.  Specifically, one law enforcement officer was positioned inside

the 229A River Street building down the hall from apartment #202.  At approximately 12:30

p.m., the undercover officer observed COLEMAN enter apartment #202 and come back out into

the hallway with a small child.  COLEMAN greeted the officer in the hallway, allowing the

officer to confirm it was in fact COLEMAN, before COLEMAN went back into apartment #202

with the child.  A short time later, law enforcement was notified that COLEMAN's 617-435-

8861 mobile phone was approximately 438 meters from Mattapan Square at the exact same time

he was observed inside 229A River Street #202, Mattapan, Massachusetts.

**Drug Traffickers' Use of Residences Generally**

54.     Based upon my training and experience, and consultation with other experienced

drug enforcement officers including DEA agents, I know that:

a.     Drug traffickers often store drugs in private places including in their residences;

b.     Drug traffickers often possess, on hand, large amounts of U.S. currency to maintain and finance their on-going business.  Because such moneys are not usually safely disposed of legitimately (e.g., deposited in a bank or declared as taxable income), it is common for those who traffic or furnish illegal schedule drugs to keep these sums on their person or near them, in a safe location, frequently in their residences;

c.     It is common for drug traffickers to maintain books, records, notes, ledgers, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances; and that the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the traffickers have ready access to them including their residences;

d.     It is common for persons involved in drug trafficking to possess evidence pertaining to their obtaining, secreting, transfer, concealment and/or

expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, electronics, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements, and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers' checks, bank checks, safe deposit box keys and money wrappers.  Those items are commonly maintained by drug traffickers at their residences, businesses or at other locations over which they maintain dominion and control;

e.      Drug traffickers commonly maintain books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization or business.  These materials are often stored at their residences; and

f.      Drug traffickers often store equipment for packaging, processing, diluting, and weighing controlled substances in a "residence" including plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades and substances used to "cut" or dilute illegal narcotics.

## CONCLUSIONS

55.      Based on the foregoing, and based on my training and experience, I submit that there is probable cause to believe that, on or about June 29, 2017 and September 27, 2017 Michael Sexton and Demone Coleman, and on or about August 10, 2017 and September 5, 2017 Michael Sexton and Austin Wilkerson, committed violations of federal law, including distributing cocaine base, a schedule II controlled substance, in violation of 21 U.S.C. §§841(a)(1) and (b)(1)(c).

56.      Based on the foregoing facts, and based on my training and experience, I believe there is probable cause to believe that violations of 21 U.S.C. §841(a)(1) have occurred at 100 Pride Way, Unit 115, Bedford, Massachusetts, as described in Attachment A; and that the items described in Attachment B, which constitute fruits, instrumentalities, and evidence of violations of §841(a)(1) are presently located within.

57.      Finally, based on the foregoing facts, and based on my training and experience, I believe Demone Coleman and others have violated 21 U.S.C §841(a)(1), and that there is

probable cause to believe that inside the residence of 229A River Street #202, Mattapan, Massachusetts, as described in Attachment A, items described in Attachment B, which constitute fruits, instrumentalities, and evidence of violations of §841(a)(1) are presently located.

Robert J. Bosken
Special Agent
VA Office of Inspector General

Sworn and subscribed to before me this 31st day of October, 2017.

HON. JENNIFER C. BOAL
United States Magistrate Judge
District of Massachusetts